# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Thomas Wayne Lovelace, | ) | |
| | ) | |
|     *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Case No: 13 C 4299 |
| | ) | |
| Les Yepsen, et al., | ) | |
| | ) | |
|     *Defendants*. | ) | Judge Frederick J. Kapala |

## ORDER

Wexford's motion for summary judgment as to exhaustion [122] is granted. Counts II and III are dismissed and Wexford is terminated from this case. Motion for partial summary judgment [125] by Yepsen, Smith, and McKenna is granted in part and denied in part. Yepsen, Smith, and McKenna are granted summary judgment on Count IV but the motion is denied as to the state-law claims in Counts V-VII.

## STATEMENT

    Plaintiff, Thomas Wayne Lovelace, has sued three corrections officers, Les Yepsen, Todd McKenna, and Darrin Smith, as well as Wexford Health Sources Inc. ("Wexford") and various John Doe defendants alleging, in part, excessive force, inhumane conditions of confinement, and deliberate indifference to his serious medical needs while he was incarcerated at the Dixon Correctional Center ("Dixon"). In particular, plaintiff alleges that he was handcuffed and then beaten, and thereafter deprived of protection from the cold and of medical care. In a seven-count amended complaint, plaintiff brings claims pursuant to 42 U.S.C. § 1983 for excessive force (Count I); deliberate indifference to his injured back (Counts II and III); and cruel and unusual punishment based on conditions of confinement (Count IV). Plaintiff also brings state-law claims for assault, battery, and intentional infliction of emotional distress ("IIED") (Counts V-VII).[1]

    Wexford moves for summary judgment on Count III, the only count against it, on failure to exhaust administrative remedies grounds. Yepsen, McKenna, and Smith move separately for partial summary judgment on the conditions of confinement and state-law claims alleged against them.

### I. BACKGROUND

    The following facts are taken from the pleadings, the parties' statements of undisputed facts, the responses and replies thereto, and the evidence submitted in support. Plaintiff was incarcerated

---

[1]These Counts are mislabled as Counts IV-VI due to the error of labeling two Counts in plaintiff's amended complaint as "Count IV."

in Housing Unit 33 of the Special Treatment Center ("STC") at Dixon on November 6, 2011. On that date, he was involved in a fight with another inmate. Yepsen, McKenna and other officers responded to Housing Unit 33. Yepsen placed plaintiff in handcuffs and plaintiff complied with Yepsen's orders. Lieutenant Burnell directed Yepsen to take plaintiff to segregation. Plaintiff was taken out of the housing unit and Yepsen helped him into the back of a van. Plaintiff heard over Yepsen's radio that he was going to receive an assault ticket for the incident, became upset, and kicked out the window on the side of the van. Plaintiff claims that he intended to kick the door in frustration but accidently kicked the window. After plaintiff broke the window, Yepsen contends he escorted him out of the van and guided him to the ground in a controlled manner. Plaintiff disputes this claiming that Yepsen and McKenna opened the van door, grabbed him by the arms, walked him across the street, and slammed him face first onto the ground. Yepsen and Burnell say they then escorted plaintiff into a second van. Plaintiff also characterizes this part differently, claiming that Yepsen and McKenna picked him up from the ground by his handcuffs and feet and pushed him into the second van. McKenna states that he stayed with the first van to supervise the clean-up efforts and the last time he recalled seeing plaintiff was outside the van with the broken window. Plaintiff disputes this claiming that McKenna accompanied him in the second van which transported him to X House.[2] According to plaintiff, Yepsen put his knee on the back of plaintiff's neck and started punching him while in the back of the van. McKenna participated along with other unidentified officers. Plaintiff agrees that Smith was not in the van.

Plaintiff maintains that at X House he was dragged from the van by his handcuffs. The lieutenant assigned to X House came out to the van and assisted in escorting plaintiff inside. As the ranking officer, the lieutenant took over the situation. Plaintiff was escorted to C Wing and placed in the shower pursuant to standard procedure. Yepsen's handcuffs were removed from plaintiff and handed to Yepsen. Yepsen claims that at that point he left X House. Plaintiff disputes that Yepsen left X House and instead maintains that Yepsen had physical control of him and "assaulted" him numerous times in X House. Plaintiff also maintains that Smith was in C Wing of X House when he arrived and Smith punched him in the ribs. According to plaintiff, Yepsen was with him until he was left in Cell 20 of C Wing in X House ("Cell 20") where Yepsen's handcuffs were removed from his wrists through the chuckhole. Plaintiff says he was hit by officers while being taken to Cell 20, and that once inside he was stripped and beaten again. Plaintiff said that Yepsen hit him in Cell 20 but he did not know if Smith or McKenna did. According to plaintiff, Cell 20 had a bed without a mattress and the window was open. Plaintiff was not able to shut the window until the next day when a nob was installed. After the cell door was closed and his handcuffs were removed, plaintiff asked for his glasses and to see a nurse. Plaintiff did not see Yepsen, McKenna, or Smith again on November 6, 2011, and did not ask any of them for additional clothing, a blanket, or a mattress. Plaintiff maintains that he was left without clothes, a mattress, or bedding for six to seven hours with only a roll of toilet paper and "[i]t was freezing temperature in there" because the window was open. In contradiction, during his deposition Officer Clark testified that he brought plaintiff a jumpsuit, mattress, and two sheets about an hour after he was placed in the cell.

---

[2]According to the record, X House is a segregation housing unit at Dixon.

Daniel Sullivan, another inmate at Dixon, saw officers "putting a pretty good beating on [plaintiff] when he was coming in[to] [C Wing] . . . [and] Yepsen was one of them." Sullivan also saw that McKenna was one of the officers bringing plaintiff into C wing and striking him.

On November 11, 2011, plaintiff filed grievance #12-1-20 complaining that Yepsen, McKenna, and Smith used excessive force against him on November 6, 2011, and that he was placed in a cell, stripped of his clothing and left for six hours without clothing or a mattress.[3] The grievance officer "referred the grievance to Internal Affairs for their review," and noted that "there's an ongoing investigation into Inmate Lovelace's allegations." The Warden, as Chief Administrative Officer, concurred. The Administrative Appeal Board denied the grievance based on the finding by Internal Affairs that the excessive force allegation was unsubstantiated and that "[p]er Dixon Correctional staff, offenders placed in segregation receive mattress, linen, and acceptable segregation property within 48 hours of placement."

On March 11, 2012, plaintiff filed grievance #12-4-15 in which he stated:

> [A]s a result of this correctional centers past/pre actions I am left feeling more hollow and alone then before. I have received no treatment for my mental illness and have received unjust profiling and excessive force from this facilitys [sic] staff. In a place where I'm supposed to get well treatment fair and unprejudiced I find I got the exact opposite. Its [sic] almost like I'm expected to lose because of the image reflected off of this facility (Dixon). Am I at fault because of having this mental disease? Do I deserve to be beat by the people who protect me? What's going on. Case aim [sic] point[,] I made a mistake and got beat for 20 min. by this sgt. Yepsen. Doesn't that seem a little strange. I think so. I have been in mental facility's [sic] all my life and never have I been assaulted by there [sic] staff not once but twice. Leaving me with back problems. Did I mention the black eye and swollen cheek the sarge gave me its so common place that most inmates don't react or say any thing because of fear of retaliation the same fear I have of any and all people of higher values that are supposed to help protect and serve us inmates kinda makes me parinoid [sic] too. What is very unique about the STC population is there are people who care but their hands are tied to these types of situations and then there are people who have sick twisted god complexes that are sadists. I really am frightened by these people.

In the "Relief Requested" portion of the grievance form, plaintiff wrote: "monetary compensation and fair and painless treatment and for help for this fear brought on by staff to go away. Because I'm very afraid. Punitive Damages bringing poor treatment to me being mentally ill." The counselor's response, dated April 6, 2012, was that "[t]he offender can request to talk to someone from therapeutic services about his mental health issues." The grievance officer reviewed the grievance on April 17, 2012, and wrote:

> **Facts Reviewed:** The grievance officer notes allegations of staff misconduct have not been substantiated. Inmate Lovelace claims he has received no therapeutic

---

[3]Plaintiff does not contend that this grievance satisfied his obligation to administratively exhaust his deliberate indifference medical claim.

3

treatment. In accordance with Department Rule 415, all treatment must be ordered by the Psychiatrist and not a matter of inmate preference. The grievance officer has no authority to evaluate clinical decisions made by licensed physicians. This grievance officer notes Inmate Lovelace is currently placed in the Dixon Psych Unit where Therapeutic Staff make rounds everyday. Inmate Lovelace has access to speaking with Therapeutic Staff daily by requesting access through the assigned security staff or by writing a request to Therapeutic Services.

Issues regarding excessive force have been previously grievance [sic], investigated by Internal Affairs and responded to by the Grievance Officer.

**Recommendation:** Based on a total review of all available information, this Grievance Officer is reasonably satisfied Inmate Lovelace's [sic] has access to therapeutic care and recommends no further action.

The Warden, as Chief Administrative Officer, concurred in the recommendation on April 23, 2012. On appeal, the Administrative Appeal Board opined as follows on December 28, 2012:

> This is in response to your grievance received on May 7, 2012, regarding Medical (mental health treatment) and Staff Conduct (Sgt. Yepsen), which was alleged to have occurred at Dixon Correctional Center. This office has determined that the issue will be addressed without a formal hearing.
>
> Offender Lovelace claims he is not receiving proper therapeutic treatment at Dixon CC. He also alleges that he was beat by Sgt. Yepsen.
>
> The Grievance Officer's Report ([#]12-4-15) and subsequent recommendation dated April 17, 2012 and approval by the Chief Administrative Officer on April 23, 2012 have been reviewed.
>
> Offender Lovelace fails to provide any specific information, such as the date of the incident, regarding his allegations of excessive force by Sgt. Yepsen, therefore this issue will not be addressed. Additionally, it is noted Offender Lovelace has previously grieved Sgt. Yepsen in Grievance #12-1-20, which was addressed by this office October 2, 2012. At the time of the grievance, Offender Lovelace was housed at Dixon Psychiatric Unit and received therapeutic treatment and access to staff daily.
>
> Based on a total review of all available information, it is the opinion of this office that the issue was appropriately addressed by the institutional administration. It is, therefore, recommended the grievance be denied.

The Director of the Illinois Department of Corrections concurred on January 3, 2013.

## II. ANALYSIS

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In evaluating such a motion, the court's role is not to weigh the evidence and determine the truth of

the matter, but to determine whether there is a genuine issue for trial. Preddie v. Bartholomew Consol. Sch. Corp., 799 F.3d 806, 818-19 (7th Cir. 2015). The court must draw all reasonable inferences in the light most favorable to the party opposing the motion. See id. at 812-13. "If a party moving for summary judgment has properly supported his motion, the burden shifts to the nonmoving party to come forward with specific facts showing that there is a genuine issue for trial." Cincinnati Life Ins. Co. v. Beyrer, 722 F.3d 939, 951 (7th Cir. 2013) (emphasis and quotation marks omitted).

## A. Exhaustion of Administrative Remedies

The Prisoner Litigation Reform Act requires that "[n]o action shall be brought with respect to prison conditions under section 1983 . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The exhaustion requirement is "designed to keep prison grievances in prisons and out of courts, on the theory that the primary responsibility for prisoner regulation should lie with prison officials rather than with federal judges." Begolli v. Home Depot U.S.A., Inc., 701 F.3d 1158, 1161 (7th Cir. 2012). Therefore, the primary purposes of § 1997e(a) are to give prison officials notice of the prisoner's problem and give them an opportunity to resolve it before a lawsuit is filed. Perez v. Wis. Dept. of Corr., 182 F.3d 532, 537-38 (7th Cir. 1999). To serve those goals and give the prison remedy process a chance of success, a prisoner "must file complaints and appeals in the place, and at the time, the prison's administrative rules require." Pozo v. McCaughtry, 286 F.3d 1022, 1025 (7th Cir. 2002).

In this case there is no dispute that plaintiff complied with the applicable administrative procedures with regard to his March 11, 2012 grievance and that the issues raised therein were properly exhausted. Instead, the parties dispute whether the grievance put Wexford on notice that plaintiff believed that he was not receiving adequate medical treatment for his injured back. Wexford argues that the grievance, on its face, alerts the Dixon staff that he was upset with the way correctional officers treated inmates with mental health issues, and that he wanted to talk to a mental health professional. According to Wexford, the plain language of the grievance failed to notify anyone that plaintiff felt that the medical treatment for his back pain was deficient in any respect.

In response, plaintiff argues that his grievance included a complaint about the lack of adequate medical care to treat his back.[4] Specifically, plaintiff relies on the language in his grievance indicating that the assault by correctional officers left him "with back problems," and that "[i]n a place where I'm supposed to get well treatment fair and unprejudiced, I find I got the exact

---

[4]Plaintiff has also submitted his own declaration with his response in opposition to Wexford's motion for summary judgment. In it he explains what he meant by the language used in the grievance. Wexford moves to strike the declaration for failure to comply with Rule 56 and Local Rule 56.1 depriving it of an opportunity to properly respond. Wexford also points out that the declaration is an improper attempt to supplement plaintiff's contrary deposition testimony and is potentially perjurous. Putting these things aside, the fact of the matter is that the declaration has no bearing on this court's analysis of the exhaustion issue because plaintiff's subjective intent in writing the grievance is not relevant. Instead, the issue is whether plaintiff's grievance put prison officials on notice that he believed his medical care for his back problems was inadequate. See Perez, 182 F.3d at 537-38 (noting that a primary purpose is to put prison officials on notice of prisoner's problem). Plaintiff's uncommunicated subjective intentions did not notify prison officials of anything.

5

opposite."[5] Plaintiff cites Riccardo v. Rausch, 375 F.3d 521, 524 (7th Cir. 2004), and Strong v. David, 297 F.3d 646, 649-50 (7th Cir. 2002), for the proposition that he was not required to provide all the facts, expound legal theories, or request a particular form of relief; he only needed to "object intelligibly to some asserted shortcoming." However, these cases were considering the exhaustion of administrative remedies through grievances file at a time when the administrative code was silent as to the level of detail required. Prior to May 1, 2003, the Illinois Administrative Code did not prescribe any required degree of specificity. Compare 20 Ill. Admin. Code § 504.810(b) (2002) and 20 Ill. Admin. Code § 504.810(b) (2003); see also Maddox v. Love, 655 F.3d 709, 721 (7th Cir. 2011) (noting the 2003 amendment requiring greater factual specificity). Effective May 1, 2003:

> The grievance shall contain factual details regarding each aspect of the offender's complaint, including what happened, when, where, and the name of each person who is the subject of or who is otherwise involved in the complaint. This provision does not preclude an offender from filing a grievance when the names of individuals are not known, but the offender must include as much descriptive information about the individual as possible.

20 Ill. Admin. Code § 504.810(b) (2003).

Even under the "generous construction" approach outlined in Riccardo and Strong, plaintiff's grievance does not sufficiently raise the issue of inadequate medical care for his back problems because it did not put prison officials on notice that he was seeking redress for that particular wrong and, as a result, did not provide them with the opportunity to remedy that shortcoming. See Riccardo, 375 F.3d at 524; Strong, 297 F.3d at 650. By extracting from the grievance the words "back problems" and "I'm supposed to get well treatment" and uniting them –even though by the court's count they are 104 words apart– plaintiff has taken his grievance completely out of context. Moreover, every official who read and considered plaintiff's grievance concluded that he was complaining about his mental health treatment and, perhaps, the already-grieved November 6, 2011 assault. No one mentioned inadequate medical care for his back problems. See Cooper v. Morgan, No. 12 C 05625, 2016 WL 1181793, at *4 (N.D. Ill. Mar. 28, 2016) (taking into consideration prison officials' responses to the grievances in determining what issues were fairly raised therein). Thus, even under the old standard before factual details regarding each aspect of the offender's complaint were required to be included in grievances, plaintiff's grievance still did not sufficiently raise the issue of inadequate treatment for his back problems. In any event, the grievance clearly does not comport with the current requirements of § 504.810 because there are insufficient factual allegations regarding the purported inadequate medical treatment of plaintiff's back problems such as "what happened, when, where."

---

[5]Plaintiff expressly states that this court need only interpret the language of the grievance to determine whether he raised the issue of inadequate medical treatment for his back problems and agrees that there is no need for an evidentiary hearing pursuant to Pavey v. Conley, 544 F.3d 739, 742 (7th Cir. 2008).

For these reasons, the court agrees that plaintiff did not exhaust his administrative remedies with respect to his claims in Counts II and III alleging deliberate indifference to his injured back.[6] Consequently, summary judgment for defendants is proper as to those Counts.

### B. Conditions of Confinement and State-Law Claims

Yepsen, McKenna, and Smith move for summary judgment on Count IV contending that plaintiff has failed to demonstrate the objective or subjective component of an Eighth Amendment cruel and unusual punishment claim based on conditions of confinement. In response, plaintiff argues that he was satisfied both components.

In order to sustain a claim for unconstitutional conditions of confinement, a plaintiff must set forth facts that, if true, would satisfy the objective and subjective components that are generally applicable to Eighth Amendment claims. Wilson v. Seiter, 501 U.S. 294, 302 (1991). With respect to the objective component, inmates do not have a constitutional right to live in comfort, but they are entitled to adequate shelter which includes protection from "extreme cold." See Dixon v. Godinez, 114 F.3d 640, 642 (7th Cir. 1997); Murphy v. Walker, 51 F.3d 714, 721 (7th Cir. 1995). Consequently, in order to avoid summary judgment, plaintiff must provide evidence showing that the temperature in the cell was excessively cold, or that he was exposed to extremely cold temperatures for an extended amount of time. See Flores v. O'Donnell, 36 F. App'x. 204, 207 (7th Cir. 2002) (finding that an inmate established a genuine issue of material fact regarding the temperature of his cell when he submitted an affidavit establishing that he was exposed to extreme cold for approximately 18 hours before having access to any clothing); see also Dixon, 114 F.3d at 642 (where an inmate presented evidence showing that for several years, the temperatures averaged approximately 49 degrees and at times fell below freezing during the winter).

Defendants contend that the evidence in this case does not satisfy the objective component because there is no evidence of the actual temperature in Cell 20 and plaintiff was eventually able to close the window. However, this incident occurred in northern Illinois in November and, during his deposition, plaintiff testified that "[i]t was freezing temperature in there." Ostensibly, it would be difficult for a prisoner to determine the precise temperature in his cell and defendants have not cited authority requiring that plaintiff do so in order to sustain a conditions of confinement claim based on lack of warmth. As for the duration that plaintiff suffered the freezing temperature, while it is true that plaintiff testified that he was eventually able to close the window in Cell 20, he made it clear that he did not do so until a knob was installed on the window the following day. Defendants also maintain that Officer Clark brought plaintiff a jumpsuit, mattress, and two sheets about an hour after he was placed in the cell. Defendants conclude that placement in a cold cell for an hour does not rise to the level of an extreme deprivation constituting a constitutional violation. That may be true, but plaintiff's deposition testimony contradicts that of Clark. Plaintiff testified that all he had for roughly six to seven hours was a roll of toilet paper. The court must draw all reasonable inferences in the light most favorable to the party opposing the motion. Preddie, 799 F.3d at 812-13.

---

[6]Count II is alleged only against John Doe defendants not Wexford. However, it is also unexhausted for the same reasons Count III is and is therefore also dismissed. See Moser v. Universal Eng'g Corp., 11 F.3d 720, 723 (7th Cir. 1993) ("The inherent authority of the district court to dismiss a case sua sponte and control its docket is well established.").

7

Because of the competing evidence, whether the temperature in plaintiff's cell was excessively cold or whether he was exposed to extremely cold temperatures for an extended period of time cannot be determined on this summary judgment record.

Yepsen, McKenna, and Smith also maintain that plaintiff has advanced insufficient evidence to establish the subjective component of his conditions-of-confinement claim because there is no evidence of their personal involvement in creating the conditions in Cell 20. An individual cannot be held liable in a § 1983 action unless he caused or participated in the alleged constitutional deprivation. See Matz v. Klotka, 769 F.3d 517, 528 (7th Cir. 2014) ("A damages suit under § 1983 requires that a defendant be personally involved in the alleged constitutional deprivation."). As it pertains to a constitutional claim based on conditions of confinement, the Seventh Circuit has "stated that deliberate indifference may be found where an official knows about unconstitutional conduct and facilitates, approves, condones, or turns a blind eye to it." Perez v. Fenoglio, 792 F.3d 768, 781 (7th Cir. 2015) (alteration and citation omitted).

Specifically, Yepsen, McKenna, and Smith argue that there is no evidence that they were present at or in Cell 20 because the evidence demonstrates that neither Smith nor McKenna escorted plaintiff to X House and Yepsen only remained there long enough to retrieve his handcuffs after plaintiff was taken to the shower. At least with regard to Yepsen, there is contradictory evidence. At his deposition, plaintiff testified that he was sure that Yepsen struck him inside Cell 20, but he was not sure whether Smith or McKenna were present. That being the circumstance, there is some evidence that Yepsen may have been aware of the conditions in the cell but not that Smith and McKenna were aware of the conditions. Plaintiff also highlights his deposition testimony that a couple of officers came by his cell, looked in, laughed, and smiled. However, plaintiff has not claimed that any of these officers were Yepsen, McKenna, or Smith and specifically testified that after he was placed in Cell 20 and his handcuffs were removed he did not see Yepsen, McKenna, and Smith again.

Nevertheless, and apart from any evidence of their knowledge of the conditions in Cell 20, the court agrees that there is insufficient evidence that it was the responsibility of Yepsen, McKenna, or Smith to furnish warmth in Cell 20 or to furnish plaintiff with a mattress, blankets, and clothing. Consequently, they could not facilitate, approve, condone, or turns a blind eye to those conditions. The only evidence in the record on this issue is that plaintiff never asked Yepsen, McKenna, and Smith to provide him with a mattress, blanket, or clothing and there was a lieutenant in charge of X House at the relevant time who bore the responsibility for monitoring the conditions in Cell 20, instead of Yepsen, McKenna, or Smith. Plaintiff must identify evidence that, if believed, shows that Yepsen, McKenna, or Smith were personally involved in depriving him of warmth in Cell 20. See Matz, 769 F.3d at 528. Plaintiff has failed to do so and, therefore, Yepsen, McKenna, and Smith are granted summary judgment on Count IV.

Lastly, Yepsen, McKenna, and Smith contend that plaintiff's state-law claims are barred by the doctrine of sovereign immunity. The Illinois State Lawsuit Immunity Act, 745 ILCS 5/1, provides generally that the State of Illinois is immune from suit in any court except the Illinois Court of Claims. See Richman v. Sheahan, 270 F.3d 430, 441 (7th Cir. 2001). A "claim against individual officers will be considered against the state" if the individual officers were (1) acting within the scope of their authority, (2) performing a duty not owed by the public generally independent of state

8

employment, and (3) engaged in matters ordinarily within that employee's normal and official functions. Id. The evidence provided by plaintiff is that he was beaten unnecessarily while he was handcuffed. While the use of reasonable force to maintain or restore discipline is within the scope of a correctional officer's authority, the use of excessive force to cause harm is not. See Hudson v. McMillian, 503 U.S. 1, 7 (1992) (explaining that where plaintiff alleges excessive force by prison official, the proper inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm"); see also Cruz v. Cross, No. 08-CV-4873, 2010 WL 3655992, at *3 (N.D. Ill. Sept. 10, 2010) (finding that alleged conduct of beating plaintiff after he was restrained exceeded the scope of officer's authority and that the first prong of the test indicates that the battery claim is not an action against the state); compare Johnson v. Winters, No. 10 C 5480, 2013 WL 4029114, at *18 (N.D. Ill. Aug. 8, 2013) (finding that sovereign immunity barred plaintiff's state law claims of battery and IIED where the battery occurred while officers were performing normal and official functions not beating a restrained inmate for no penological purpose). Thus, when viewed in a light most favorable to plaintiff, there is evidence that defendants were acting outside the scope of their authority. Sovereign immunity therefore does not bar plaintiff's state law claims of assault, battery, and IIED and the court denies the motion for summary judgment on those claims.

### III. CONCLUSION

The motion for summary judgment filed by Wexford is granted and Counts II and III are dismissed for failure to exhaust administrative remedies. Wexford is terminated from this case. The motion for partial summary judgment by Yepsen, McKenna, and Smith is granted in part and denied in part. Yepsen, McKenna, and Smith are granted summary judgment on Count IV of the amended complaint but plaintiff's state-law claims remain pending.

Date: 4/26/2016                              ENTER:

                                             _____
                                             FREDERICK J. KAPALA
                                             District Judge